EFiled: Sep 19 2022 09:50AM EDT
Transaction ID 68119424
Case No. 2021-0595-LWW

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WILLIAM J. BROWN,       )
                  )
      Plaintiff,    )
                  )
    v.           )
                  )   C.A. No. 2021-0595-LWW
MATTERPORT, INC., MATTERPORT  )
OPERATING, LLC, R.J. PITTMAN,   )
PETER HEBERT, JASON      )
KRIKORIAN, and MICHAEL    )
GUSTAFSON,         )
                  )
      Defendants.

## VERIFIED THIRD AMENDED COMPLAINT

Plaintiff William J. Brown ("Brown"), by and through his undersigned attorneys, as and for his complaint against Defendants Matterport, Inc. (formerly known as Gores Holdings VI, Inc., "Matterport"), Matterport Operating, LLC ("Legacy Matterport" and collectively with Matterport, the "Entity Defendants"), and R.J. Pittman, Peter Hebert, Jason Krikorian, and Michael Gustafson (collectively, the "Director Defendants"), upon knowledge as to himself and his own acts and upon information and belief as to all other matters, alleges as follows:

## INTRODUCTION

1.    Brown brings this Third Amended Complaint to seek relief from Defendants' improper actions that impeded and prevented him from selling his Matterport shares.

EXH. 1-1

2.      Legacy Matterport was a privately-held company that in July 2021 merged into a wholly-owned subsidiary of Matterport (the "Business Combination Transaction").   For 5 years, Brown was the Chief Executive Officer of Legacy Matterport, departing in December 2018.  As part of his compensation, Brown was able to purchase certain shares of restricted stock and received certain stock options. After he left Legacy Matterport, Brown exercised his stock options and, at the time of the Business Combination Transaction, Brown owned 1,387,000 Legacy Matterport shares.

3.      As a result of the Business Combination Transaction, Brown had the right to receive shares of Matterport upon submission of a letter of transmittal to Matterport's transfer agent along with certificates for his Legacy Matterport shares. In November 2021, Brown submitted letters of transmittal along with certificates for his Legacy Matterport shares to Matterport's transfer agent and the transfer agent issued 5,713,441 uncertificated Matterport shares to Brown's account at the transfer agent.   However, Matterport, under the direction of the Director Defendants, improperly contended that the shares Brown received were subject to transfer restrictions contained in Matterport's Amended & Restated Bylaws (the "A&R Bylaws") and prevented Brown from transferring the shares to his brokerage account so they could be sold.

EXH. 1-2

4.     On November 24, 2021, Brown explained to Matterport that his Matterport shares were not subject to the transfer restrictions and demanded that the unrestricted shares be transferred to Brown's brokerage account.  Matterport refused to transfer the shares.   On November 30, 2021, Brown also explained this to Matterport's transfer agent, American Stock Transfer & Trust Company, LLC ("AST"), and demanded that the unrestricted shares be transferred to Brown's brokerage account.   On or about Friday, December 17, 2021, the 5,713,441 Matterport shares were delivered without restriction to Brown's brokerage account by AST.  However, Matterport instructed AST to remove the shares from Brown's brokerage account and AST did so on or about Monday, December 20, 2021, thereby preventing Brown from selling the shares.

5.     On January 10, 2022, the Court issued its Memorandum Opinion confirming that Brown's shares were not and had never been subject to transfer restrictions.  In its Memorandum Opinion, the Court found, among other things, "that Brown was not issued Matterport shares until at least November 5 and 19, 2021 – after he sent executed letters of transmittal to Matterport's transfer agent."   On January 12, 2022, based upon the Memorandum Opinion, the Court issued an Order and Partial Final Judgment (the "Judgment").  After the Memorandum Opinion was issued, Matterport and AST delivered the 5,713,441 unrestricted shares to Brown's brokerage account.  However, by that time Matterport's share price had declined by

more than half from the price at the end of November 2021 shortly after Brown had submitted his Letters of Transmittal and demanded that Matterport deliver the unrestricted shares.

6.    Entity Defendants appealed this Court's Judgment but, on July 27, 2022, the Delaware Supreme Court affirmed the Judgment.   Brown now brings this Third Amended Complaint to seek redress for the harm caused by Defendants' conduct.

## THE PARTIES

7.    Plaintiff William J. Brown is an individual residing in Dorado, Puerto Rico.

8.    Defendant Matterport, Inc. is a corporation incorporated in the State of Delaware with its principal place of business at 352 East Java Drive, Sunnyvale, California 94089.

9.    Defendant Matterport Operating, LLC is a Delaware limited liability company with its principal place of business at 352 East Java Drive, Sunnyvale, California 94089.

10.    Defendant R.J. Pittman is an individual believed to be residing in the State of California, is the Chief Executive Officer of Legacy Matterport, was a director of Legacy Matterport prior to the Business Combination Transaction, and is the current Chief Executive Officer and a current director of Matterport.

EXH. 1-4

11.     Defendant Peter Hebert is an individual believed to be residing in the State of California, was a director of Legacy Matterport prior to the Business Combination Transaction, and is a current director of Matterport.

12.     Defendant Jason Krikorian is an individual believed to be residing in the State of California, was a director of Legacy Matterport prior to the Business Combination Transaction, and is a current director of Matterport.

13.     Defendant Michael Gustafson is an individual believed to be residing in the State of California, was a director of Legacy Matterport prior to the Business Combination Transaction, and is a current director of Matterport.  Defendants R.J. Pittman, Peter Hebert, Jason Krikorian and Michael Gustafason will be referred to herein collectively as the "Director Defendants."

## JURISDICTION

14.     This Court has subject matter jurisdiction over this action pursuant to 8 *Del. C.* § 111; 10 *Del. C.* § 341, 10 *Del. C.* § 4001, 12 *Del C.* § 1146, and the Delaware Declaratory Judgment Act 10 *Del. C.* § 6501, *et seq*.

MDSU W0322742.v1

EXH. 1-5

## BACKGROUND

**A.     Brown's Successful Five-Year Tenure As CEO Of Legacy Matterport And His Equity Compensation**

15.     Legacy Matterport is a spatial data company that creates 3D technologies to provide remote, virtual tours of physical spaces such as properties for sale.

16.     From November 2013 to December 2018, Brown was Legacy Matterport's Chief Executive Officer. When Brown began his tenure at Legacy Matterport, the company was pre-revenue and pre-product. Brown raised tens of millions of dollars in funding and transformed Legacy Matterport into a market-leading company with a vast network of customers and proprietary artificial intelligence capabilities.  By the end of his tenure as Chief Executive Officer, Legacy Matterport was a thriving, rapidly-growing company with a substantial revenue run rate and industry-leading technologies.

17.     As part of his compensation as Legacy Matterport's Chief Executive Officer, Brown received the opportunity to purchase restricted stock, which he did, and also received stock options, which he later exercised.  In December 2020, Brown held 1,387,000 shares of Legacy Matterport. Several agreements between Brown, Legacy Matterport, and other parties, governed Brown's rights and obligations with respect to these securities, including whether and under what circumstances Brown's

shares would ever become subject to a lockup restriction (the "Legacy Matterport Agreements").

18.    The Legacy Matterport Agreements imposed no lockup period or other trading restrictions on Brown's Legacy Matterport shares or the consideration he would receive for such shares in the event of a merger with a publicly-listed company via a de-SPAC transaction.

**B.    Legacy Matterport Unsuccessfully Attempts To Impose New Transfer Restrictions On Brown**

19.    In December of 2020, just two months before announcing a de-SPAC transaction with Gores Holdings VI, Legacy Matterport attempted, unsuccessfully, to negotiate with Brown a transfer restriction that could potentially have locked up Brown's shares in the event of a de-SPAC.  During these negotiations, Legacy Matterport did not disclose to Brown that Legacy Matterport was in discussions with SPACs to enter into a transaction.  Brown did not agree to these transfer restrictions.

**C.    Legacy Matterport And Gores Holdings VI Announce A De-SPAC**

20.    Gores Holdings VI was incorporated on June 29, 2020 for the purpose of effecting a merger or similar transaction with one or more private businesses, using the proceeds of an IPO. As a "blank check" company formed solely for purposes of a transaction like the one here, Gores Holdings VI had no operations.

7

EXH. 1-7

21.    On December 15, 2020, Gores Holdings VI completed an initial public offering, raising $345 million.

22.    Less than two months later, on February 8, 2021, Gores Holdings VI and Legacy Matterport announced their agreement to enter into the Business Combination Transaction.  Their plan entailed having Legacy Matterport merge with two subsidiaries of Gores Holdings VI with Gores Holdings VI changing its name to Matterport, Inc. and owning 100% of the outstanding equity interests in the surviving entity. Each holder of Legacy Matterport shares would have a right to receive Class A shares from Matterport, but only if they signed and submitted a Letter of Transmittal along with their share certificates.  Legacy Matterport shareholders were expected to hold approximately 75% of all Class A common stock.  The combined entity, as Matterport, would apply to continue the listing of Class A stock on the NASDAQ under the symbol MTTR, and continue operating Legacy Matterport's business.

23.    According to Entity Defendants' announcement, Matterport would have an implied pro forma enterprise value of approximately $2.3 billion and an equity value of approximately $2.9 billion at closing.

24.    Concurrently with the consummation of the Business Combination Transaction, additional investors, including at least one favored existing Legacy Matterport shareholder affiliated with a Matterport director, purchased shares of

8

common stock of Matterport in a Private Investment in Public Equity transaction

("PIPE"). Specifically, a Lux Capital entity affiliated with Director Defendant Peter

Hebert, who is a principal of Lux Capital, participated in the PIPE, investing an

amount of $1 million, as reflected in subsequent SEC filings.

25.     The Business Combination Transaction closed on July 22, 2021.

**D.     The A&R Bylaws Contain Transfer Restrictions That Matterport Incorrectly Claimed Applied to Brown's Shares**

26.     Although the Legacy Matterport Agreements governing Brown's

shares imposed no trading restrictions for de-SPAC transactions, Defendants, via the

A&R Bylaws, claimed to have imposed transfer restrictions that applied to Brown.

27.     Section 7.10(a) of the A&R Bylaws states:

> Subject to Section 7.10(b), the holders (the "**Lockup Holders**") of shares of Class A common stock, par value $0.0001 per share ("**Class A common stock**"), of the Corporation issued (i) as consideration under that certain Agreement and Plan of Merger, dated as of February 7, 2021, by and among the Corporation, Maker Merger Sub, Inc., a Delaware corporation, Maker Merger Sub II, LLC, a Delaware limited liability company, and Matterport Operating, LLC (formerly, Matterport, Inc., a Delaware corporation) (the "**Business Combination Transaction**"), or (ii) to directors, officers and employees of the Corporation upon the settlement or exercise of restricted stock units, options or other equity awards outstanding as of immediately following the closing of the Business Combination Transaction in respect of awards of Matterport, Inc. outstanding immediately prior to the closing of the Business Combination Transaction (such shares referred to in Section 7.10(a)(ii), the "**Legacy Equity Award Shares**"), may not Transfer any Lockup Shares until the end of the Lockup Period (the "**Lockup**").

> Notwithstanding anything to the contrary, in no event will a holder of shares of Class F common stock, par value $0.0001 per share ("**Class F common stock**"), of the Corporation who receives shares of Class A common stock upon conversion thereof in connection with the closing of the Business Combination Transaction or a holder of shares Class A common stock who purchased such shares pursuant to private placement in connection with the Business Combination Transaction be deemed to be a Lockup Holder.

28.    Section 7.10(d) of the A&R Bylaws defines "Lockup Shares," as "shares of Class A common stock held by the Lockup Holders immediately following the closing of the Business Combination Transaction" and defines the "Lockup Period" as "the period beginning on the closing date of the Business Combination Transaction and ending on the date that is 180 days after the closing date of the Business Combination Transaction."

29.    In addition, the A&R Bylaws purport to restrict the ability of shareholders to enter private transactions with third parties that do not involve the transfer of Matterport shares. Section 7.10(d)(iii) of the A&R Bylaws purports to restrict any form of derivative trading that might replicate the economic effect of a sale of stock. Section 7.10(d)(iii) defines the term "Transfer" as:

> the (A) sale or assignment of, offer to sell, contract or agreement to sell, hypothecate, pledge, grant of any option to purchase or otherwise dispose of or agreement to dispose of, directly or indirectly, or establishment or increase of a put equivalent position or liquidation with respect to or decrease of a call equivalent position within the meaning of Section 16 of the Exchange Act with respect to, any security, (B) entry into any swap or other arrangement that transfers to another, in whole or

in part, any of the economic consequences of ownership of any security, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise, or (C) public announcement of any intention to effect any transaction specified in clause (A) or (B).

30.     The Director Defendants, like all or most Matterport insiders, would in all likelihood have had to agree to some form of transfer restrictions on their and their affiliates' Matterport shares in order to close the Business Combination Transaction.   Therefore, the Director Defendants would directly benefit from imposing without consent the transfer restrictions by a bylaw on all shares that would be received by Legacy Matterport shareholders rather than only on those shares held by persons who agreed to be locked up.  These bylaw transfer restrictions would artificially reduce the supply of shares available for sale, referred to as the float, and thereby reduce any potential negative selling pressure on the share price while the Director Defendants and/or their affiliates were themselves locked up.

31.     In furtherance of their scheme to impose transfer restrictions on the Matterport shares that would be received by non-insider Legacy Matterport shareholders, on information and belief the Director Defendants instructed Matterport to prevent Brown from transferring his shares even though the transfer restriction in the A&R Bylaws did not by its terms apply to Brown's Matterport shares.

**E.      Defendants Restrict Brown From Trading By Claiming The A&R Bylaws Apply To Brown**

32.    In late March 2021, Brown learned through counsel for Legacy Matterport that Defendants intended to impose trading restrictions on some Matterport shareholders following the close of the Business Combination Transaction through newly adopted A&R Bylaws.

33.    Brown informed Legacy Matterport that the transfer restrictions could not be imposed by the A&R Bylaws on him under Delaware law.  Legacy Matterport contended that the restrictions would comply with Section 202 of the General Corporation Law of the State of Delaware ("DGCL") because they would apply to the Matterport shares that would be issued in exchange for shares in Legacy Matterport, and the A&R Bylaws would go into effect prior to the issuance of those shares. Legacy Matterport also contended that the A&R Bylaws could impose restrictions prohibiting derivative trading with third parties, even when such trading did not involve the transfer of Matterport shares.

34.    Brown responded that Delaware law did not support these assertions and that transfer restrictions cannot be imposed without consent.  As demonstrated at the first phase trial in this case, the use of bylaw amendments to impose transfer restrictions in de-SPACs is a relatively new phenomenon. And in those de-SPACs

MDSU W0322742.v1

EXH. 1-12

in which bylaw amendments were implemented, there is no documented evidence that any shareholder actually objected to the restrictions.

35.     Also improper was Defendants' attempt to restrict forms of derivative trading that do not require the delivery of Matterport shares to a third-party and therefore do not constitute a transfer, as well as Defendant's attempt to restrict speech rights.  Delaware law does not permit Defendants to unilaterally limit the freedom to contract with third parties to purchase or sell call or put options, or to enter into swap arrangements, that do not involve the delivery of Matterport shares during the purported transfer restriction window or to restrict speech.

36.     In addition, the directors of Legacy Matterport and Matterport apparently intended to attempt to deprive Brown of his appraisal rights. The Legacy Matterport Agreements contain drag-along obligations that negate Brown's appraisal rights, in the event of a "Liquidation Event." But the definition of "Liquidation Event" in Legacy Matterport's Charter at the time the agreements were entered did not include a transaction like the Business Combination Transaction. Accordingly, in an apparent effort to retroactively eliminate Brown's appraisal rights, on February 9, 2021, Legacy Matterport issued a notice to stockholders stating that it had re-defined the term "Liquidation Event" in an amendment to Legacy Matterport's Charter to specifically include the Business Combination Transaction.

37.     Ultimately, however, this unlawful effort to deprive Brown (and potentially other shareholders) of appraisal rights was abandoned after it became clear that Brown had retained securities litigation counsel and/or filed this action. On July 29, 2021, Legacy Matterport circulated to stockholders a Notice of Appraisal Rights.

38.     On August 13, 2021, in order to hedge his position, Brown gave notice of exercise of appraisal rights with respect to 1,347,000 of his Legacy Matterport shares, but not as to 40,000 of his Legacy Matterport shares.  Under Section 262(e) of the DGCL, the last day to commence an appraisal proceeding by filing a petition in the Court of Chancery demanding a determination of the value of the stock was November 19, 2021.

## F.     Defendants Attempt To Use the Letter of Transmittal To Extract a Release From Brown

39.     Letters of transmittal are a mechanism for stockholders to claim their merger consideration.  They should be non-controversial.  But Defendants were determined to try to squeeze something more from their letter of transmittal.

40.     In order for Brown to receive merger consideration, Defendants intended to demand that Brown release all claims against them, even unknown claims, pursuant to a one-sided release clause.  The original letter of transmittal that

EXH. 1-14

Defendants planned to use and require Brown and other shareholders to sign in order

to receive Class A shares in Matterport provided in part:

> Effective from and after the Effective Time and in consideration of the right to receive the Per Share Consideration and Earn Out Shares, if applicable, subject to and in accordance with the terms set forth in Merger Agreement, the undersigned, on behalf of himself, herself or itself and on behalf of his, her or its past, present and future heirs, executors, administrators, predecessors-in-interest, successors, permitted assigns, equityholders, general or limited partners and his, her or its and their respective Affiliates and Representatives (each, a "Releasing Party"), hereby knowingly, voluntarily, irrevocably, unconditionally and forever acquits, releases and discharges, and covenants not to sue, Parent, First Merger Sub, Second Merger Sub, the Company, their respective predecessors, successors, parents, subsidiaries and other Affiliates and their respective past, present and future owners, managers, members, general and limited partners, stockholders, fiduciaries (in their official and individual capacities), and Representatives (in their capacities as such) (each, a "Released Party" and, collectively, the "Released Parties"), from any and all liabilities, penalties, fines, judgments (at equity or at law, including statutory and common) and other losses (including damages, asserted or unasserted, express or implied, foreseen or unforeseen, suspected or unsuspected, known or unknown, matured or unmatured, contingent or vested, liquidated or unliquidated, of any kind or nature or description whatsoever), in each case arising from any matter, cause or event occurring at any time at or prior to the Effective Time that a Releasing Party presently has, has ever had or may hereafter have, in each case, to the extent arising out of his, her or its ownership of shares of Company Stock . . . .

(the "Release").

41.     If Brown declined to agree to the one-sided Release, he would receive

nothing from the Business Combination Transaction, despite owning 1,387,000

shares of Legacy Matterport.  Delaware law does not permit Defendants to absolve themselves of fraud and other intentional wrongdoing by using economic duress to force shareholders to sign overbroad releases. *See, e.g., Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1064 (Del. Ch. 2006); *Data Mgmt. Internationale, Inc. v. Saraga*, 2007 WL 2142848, at *5 (Del. Super. July 25, 2007); Restatement (Second) of Contracts § 195(a).

42.    Defendants abandoned the original letter of transmittal after Brown filed this Action and, on the eve of the Business Combination Transaction, determined to replace it with the New Letter of Transmittal.  While Defendants claimed to this Court that the Release was not included in the New Letter of Transmittal because the transfer agent for Matterport was switched and the new transfer agent's form did not include the Release, documents produced in this Action show that Defendants sought to have the same or a similar release included in the New Letter of Transmittal.  Therefore, Defendants removed the release language from the New Letter of Transmittal in response to Brown raising the release issue in this Action, and Brown therefore conveyed a substantial benefit to the shareholders of Legacy Matterport.

43.    While the New Letter of Transmittal removed the obviously coercive release, it was still coercive and improper in a subtler way.  It included a representation by the tendering stockholder that "the undersigned does not hold any

EXH. 1-16

(i) shares of Company Stock other than the shares of Company Stock set forth in the 'Description of Company Stock Surrendered' below or (ii) other equity securities or rights to purchase shares or other interests of the Company of any kind or nature other than any Company Equity Awards, as applicable[.]"

44.     Brown, who had exercised appraisal rights over a substantial portion of his Legacy Matterport shares in order to hedge his risk, could not make that representation.

45.     Yet when Brown asked Defendants to correct their misleading New Letter of Transmittal to accurately communicate to stockholders that they could split their holdings, Defendants refused.  Instead, Defendants insisted on standing by the misleading New Letter of Transmittal that made stockholders think that they faced a binary choice of either tendering all of their stock or tendering none.

46.     This presented stockholders with a Hobson's choice that was based on a false premise that the decision was all or nothing, and appears to have been a continuation of Defendants' original but partly abandoned scheme to deprive Legacy Matterport shareholders of appraisal rights by redefining "Liquidation Event" in Legacy Matterport's Charter. After reading Defendants' misleading New Letter of Transmittal, a stockholder would believe that either (1) they could accept the improper transfer restrictions in total for all of their stock; or (2) seek appraisal for all of their stock. But the premise of an all-or-nothing choice is false because even

EXH. 1-17

Defendants recognized that stockholders can split their choice across both options. However, the New Letter of Transmittal precluded that option.

## G.    Brown Revises And Submits Two Letters of Transmittal

47.    Eventually, Brown decided to modify the language of the New Letter of Transmittal to take out the objectionable portions and submit the revised letters. He did so, indicated that the letters were revised in bold on the first line, and in November 2021 submitted the letters of transmittal to Matterport's transfer agent.

48.    Specifically, on November 9, 2021, Brown caused a revised letter of transmittal, Legacy Matterport Stock Certificate Number CS-28 for 37,000 shares that were not subject to Brown's notice of exercise of appraisal rights, an IRS Form W-9, and a prepaid Federal Express International return label to be personally delivered to AST's Operations Center located in Brooklyn, New York.  Though the partial hedge created by the notice of exercise of appraisal rights was expiring, Brown decided not to commence the appraisal proceeding by the November 19, 2021 deadline because appraisal would have been a long and expensive process with an uncertain outcome, Matterport's stock price was doing well, and Brown felt confident in his position that Matterport could not legally restrict his trading of the Matterport shares he would receive.  Although it had the right to do so, Matterport also did not commence an appraisal proceeding by the November 19, 2021 deadline. On November 19, 2021, Brown caused a revised letter of transmittal, Legacy

18

EXH. 1-18

Matterport Digital Share Certificates CS-169 for 695,000 shares, CS-170 for 229,916 shares, CS-171 for 425,084 shares, an IRS Form W-9, and a prepaid Federal Express International return label to be personally delivered to AST's Operations Center located in Brooklyn, New York, shortly before the close of the business day.

**H.     Brown Receives His Matterport Shares And Demands That Matterport Allow Him To Transfer His Shares But Matterport Stops Him**

49.     On or about November 22, 2021, AST mailed Brown a check for $3.60 and a Direct Registration Book-Entry Advice (the "Book-Entry Advice") for 5,713,441 shares of Matterport Inc. Class A Common Stock.  The Book Entry Advice incorrectly stated:  "THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO LOCKUP RESTRICTIONS SET FORTH IN SECTION 7.10 OF THE AMENDED & RESTATED BYLAWS OF MATTERPORT, INC. AND MAY ONLY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF DURING THE TERM OF THE LOCKUP PURSUANT TO THE TERMS SET FORTH IN THE AMENDED & RESTATED BYLAWS."

50.     On November 24, 2021, Brown sent to Matterport a formal demand that Matterport or AST deliver Brown's Matterport shares to Brown's brokerage account at Fidelity Investments.  In that letter, Brown explained that the shares were not subject to the transfer restrictions because they were not Lockup Shares as defined in the A&R Bylaws.  The demand stated:  "**Please be on notice that Matterport**

EXH. 1-19

**will be liable for any loss resulting from a delay in delivering the unrestricted shares to Mr. Brown's account."**  Matterport did not deliver the shares.

51.    On November 30, 2021, Brown sent a formal demand to AST, with a copy to Matterport, to deliver Brown's Matterport shares to Brown's brokerage account at Fidelity Investments.  In that letter, Brown explained that the shares were not subject to the transfer restrictions because they were not Lockup Shares as defined in the A&R Bylaws.  The demand stated:  **"Please be on notice that AST will be liable for any loss resulting from a delay in delivering the unrestricted shares to Mr. Brown's account."**  AST did not deliver the shares until weeks later.

## I.    The Phase One Trial and Judgment

52.    The trial in this case was bifurcated so that the question to be decided in the first phase was whether Brown was bound by the transfer restrictions in the A&R Bylaws.  The trial commenced on December 1, 2021, with witness testimony presented that day and on December 2, 2021.  The parties then submitted post-trial briefs, and the Court heard post-trial arguments on December 21, 2021.

53.    On January 10, 2022, the Court issued its Memorandum Opinion finding that "Brown was not issued Matterport shares until at least November 5 and 19, 2021" and concluding that "Brown's Matterport shares are not Lockup Shares under Section 7.10 of the A&R Bylaws.  He may therefore freely trade his Matterport

shares and enter into derivative transactions with respect to those shares without restriction.  All other relevant issues remain for the second phase of this litigation."

54.    Only after the Court issued its Memorandum Order did Matterport allow AST to deliver Brown's 5,713,441 unrestricted Matterport shares back to his account at Fidelity.  When AST did so on January 11, 2022, Brown commenced selling his Matterport shares.  By then, the share price had dropped substantially from when Brown received his shares in book entry form at AST in late November 2021.  For example, Matterport's share price reached a high of $37.60 on December 1, 2021, after Brown demanded that Matterport deliver unrestricted shares to his Fidelity account, but had declined to open at $16.21 on January 11, 2022, and close that day at $16.39.  The lockup in Matterport's A&R Bylaws was scheduled to expire five trading days later on January 19, 2022, at which point Matterport's share price was expected to decline even further.

55.    On January 12, 2022, the Court issued its Judgment.  Consistent with the Memorandum Opinion, the Judgment held that "William J. Brown's Matterport shares are not Lockup Shares under Section 7.10 of the A&R Bylaws" and that "William J. Brown may freely trade his Matterport shares and enter into derivative transactions with respect to those shares without restriction."

56.    Brown sold his 5,713,441 Matterport shares between January 11, 2022 and January 18, 2022 because Matterport's lockup was scheduled to expire on

January 19, 2022 and he wanted to be out of the position before that happened. Brown received a weighted average sales price of approximately $14.09 per share resulting in total proceeds of approximately $80,502,383.69.

57.     Matterport appealed the Judgment on February 8, 2022.  On July 27, 2022, the Delaware Supreme Court affirmed the Judgment.

## COUNT I
## DECLARATORY JUDGMENT
### (Facial Validity – Against Matterport and Legacy Matterport)

58.     Brown repeats each and every allegation contained in paragraphs 1 through 57 above as if fully set forth herein.

59.     An actual controversy arose between Brown and Defendants regarding the validity of the transfer restrictions and Brown's rights to freely transfer shares he was entitled to receive in Matterport, and/or engage in derivative trading relating to Matterport.

60.     Matterport and Legacy Matterport's conduct subjected Brown to the complete loss of liquidity in the Matterport shares he was entitled to and eventually did receive along with significant market risk.

61.     The controversy between Brown and Matterport/Legacy Matterport was real and substantial and demanded specific relief through a decree of a conclusive character.  Under the Delaware Declaratory Judgment Act (the "Act"), 10 *Del. C.* § 6501, *et seq.*, Delaware courts "have the power to declare rights,

MDSU W0322742.v1

EXH. 1-22

status and other legal relations, whether or not further relief is or could be claimed." 10 *Del. C.* § 6501. Under the Act, "[a] person … whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder." *Id.* § 6502. "A contract may be construed either before or after there has been a breach thereof." *Id.* § 6503. "The power of Delaware courts to grant declaratory relief is to "be liberally construed and administered." *Id.* § 6512.

62.     Based on the above alleged facts, Brown sought a judicial declaration of his rights under the Matterport A&R Bylaws.

63.     The Court issued a decree of conclusive character when, on January 10 and January 12, 2022, the Court, respectively, issued its Memorandum Opinion and Judgment which declared, among other things, that "Brown was not issued Matterport shares until at least November 5 and 19, 2021[,]" that "Brown's Matterport shares are not Lockup Shares under Section 7.10 of the A&R Bylaws[,]" and that "Brown may freely trade his Matterport shares and enter into derivative transactions with respect to those shares without restriction."

64.     The Judgment was affirmed by the Delaware Supreme Court on July 27, 2022.

EXH. 1-23

65.     Pursuant to 10 *Del. C.* § 6508, the Court should award Brown damages against Matterport and Legacy Matterport to compensate Brown for the harm caused by their enforcement of the transfer restrictions in the A&R Bylaws against him.  Such further relief is necessary or proper.  These damages should be calculated by identifying a reasonable period after the restriction was imposed during which Brown could have otherwise sold the shares and then selecting the highest intermediate price during that period as the presumed sales price.  *See, e.g., Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023 (Del. 2000).   Here, AST mailed Brown notice that he had been issued 5,713,441 Matterport shares on November 22, 2021, and Brown received the notice on or about November 27, 2021.  A reasonable period to sell the shares would be approximately 10 trading days which would end on December 10, 2021.  The highest intermediate price during this period occurred on December 1, 2021, when Matterport's stock price was $37.60, so the presumed sales price of Brown's 5,713,441 shares is $214,825,381.60. From the presumed sales price the Court should deduct the average share price during a reasonable period after the restriction was lifted during which Brown could have sold his shares.  *See, e.g., Duncan v. TheraTx, Inc.*, 775 A.2d at 1024. Here, the restriction was lifted on January 11, 2022.  Using the same approximately 10 trading days as the reasonable period to sell the shares, the period would end on January 25, 2022.  The average price of Matterport shares

EXH. 1-24

during the period was approximately $12.87 per share, making the presumed sales price $73,531,985.67.  Therefore, Brown's damages amount to approximately $141,293,395.93, and the Court should award him that amount plus prejudgment interest.  These time periods and calculations will be refined through expert testimony.

66.     Pursuant to 10 *Del. C.* § 6510, Brown is also entitled to his costs in bringing this declaratory judgment action.

## COUNT II
## VIOLATION OF 8 *Del. C.* § 202
### (Against Matterport and the Director Defendants)

67.     Brown repeats each and every allegation contained in paragraphs 1 through 57 above as if fully set forth herein.

68.     Section 202 of the DGCL permits the enforcement of restrictions on transfers of stock only when such restrictions comply with Section 202 or are otherwise lawful.

69.     On November 24, 2021, Brown sent to Matterport a formal instruction and demand that Matterport or AST deliver Brown's Matterport shares to Brown's brokerage account at Fidelity Investments unrestricted and free of restrictive legend since the shares were not subject to the transfer restrictions set forth in the A&R Bylaws.  Matterport, under the direction of the Director Defendants, failed and refused to deliver the shares.

EXH. 1-25

70.   On November 30, 2021, Brown sent a formal instruction and demand to AST, with a copy to Matterport, to deliver Brown's Matterport shares to Brown's brokerage account at Fidelity Investments.  In that letter, Brown explained that the shares were not subject to the transfer restrictions.  Matterport's transfer agent, under the direction of Matterport and the Director Defendants, did not deliver the shares.

71.   Brown's shares of Matterport stock were not subject to any transfer restrictions that complied with Section 202 of the DGCL or any other lawful transfer restrictions.

72.   Matterport and the Director Defendants violated Section 202 of the DGCL when in late November 2021, they prevented Brown from transferring his shares of Matterport stock, and failed to execute Brown's instructions to transfer the shares.   Matterport and the Director Defendants' violation of Section 202 entitles Brown to equitable and other relief including, but not limited to, damages or other relief which may include the issuance of additional Matterport shares to Brown.

73.   Matterport and the Director Defendants are liable to Brown for his loss resulting from their preventing him from transferring his Matterport shares. The transfer should have been permitted or made on or shortly after Brown demanded that Matterport transfer his shares on November 24, 2021.  Matterport

EXH. 1-26

and the Director Defendants caused Brown damages by preventing Brown from selling his Matterport shares.  Brown's damages should be calculated by identifying a reasonable period after the transfer was refused during which Brown could have otherwise sold the shares and then selecting the highest intermediate price during that period as the presumed sales price.  *See, e.g., Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023 (Del. 2000).  Here, Brown requested the transfer on November 24, 2021, and the transfer should have been effected on November 29, 2021, the next business day after the Thanksgiving weekend.  A reasonable period to sell the shares would be approximately 10 trading days after that which would end on December 13, 2021.  The highest intermediate price during this period occurred on December 1, 2021, when Matterport's stock price was $37.60, so the presumed sales price of Brown's 5,713,441 shares is $214,825,381.60.  From the presumed sales price the Court should deduct the average share price during a reasonable period during which Brown could have sold his shares after the restriction was lifted and the transfer was permitted.  *See, e.g., Duncan v. TheraTx, Inc.*, 775 A.2d at 1024.  Here, the restriction was lifted and the transfer was permitted on January 11, 2022.  Using the same approximately 10 trading days as the reasonable period to sell the shares, the period would end on January 25, 2022.  The average price of Matterport shares during the period was approximately $12.87 per share, making the presumed sales price $73,531,985.67.  Therefore,

Brown's damages amount to approximately $141,293,395.93.  Matterport and the Director Defendants are liable to Brown for damages in this amount, plus prejudgment interest.  These time periods and calculations will be refined through expert testimony.

<u>**COUNT III**</u>
**BREACH OF FIDUCIARY DUTY**
**(Against Director Defendants)**

74.    Brown repeats each and every allegation contained in paragraphs 1 through 57 above as if fully set forth herein.

75.    As directors of Matterport and Legacy Matterport, the Director Defendants owe Matterport and Legacy Matterport shareholders including Brown fiduciary duties of loyalty and care.

76.    The Director Directors have violated their fiduciary duties by adopting, enacting, and enforcing the transfer restrictions in the A&R Bylaws against Brown, both while they were directors of Legacy Matterport and as current directors of Matterport, including by taking actions designed primarily to prevent Brown from exercising his legitimate rights to sell Matterport shares or to engage in derivative trading.

77.    In imposing transfer restrictions on Brown and preventing Brown from selling his shares, the Director Defendants were acting in their own self-interests rather than in the interest of Matterport.

EXH. 1-28

78.     Director Defendant Hebert, being the principal of and/or associated with Lux Capital and its affiliates, one of Legacy Matterport's largest shareholders, knew that he and his funds would have to agree to be locked up as part of any de-SPAC transaction or at least appear to be locked up.  Therefore, he had an interest to ensure that all other Legacy Matterport shareholders who would receive Matterport shares also would be locked up so that those shareholders could not sell Matterport shares before he and/or the Lux Capital affiliates could sell.  On information and belief, Director Defendant Hebert also arranged for one of the Lux Capital affiliates to invest in the PIPE transaction that was part of the de-SPAC so as to exclude that affiliate's shares from the lockup without such exclusion becoming obvious to the market.  The A&R Bylaws are drafted in such a manner that the persons who purchase shares in the PIPE are excluded from the definition of Lockup Holder, so the transfer restrictions in the A&R Bylaws did not apply to PIPE investors or the Matterport shares that they owned. Therefore, the Hebert / Lux Capital affiliate's purchase of 100,000 shares in the PIPE for $1 million ensured that the Hebert / Lux Capital affiliate could freely trade tens of millions of dollars' worth of Matterport shares before the A&R Bylaw lockup expired. In addition, the PIPE investment was oversubscribed, having more interest from unaffiliated investors than could be accommodated, so the Entity Defendants had to expend effort to reduce the amount of investment from new investors in order to

EXH. 1-29

specially accommodate the Hebert / Lux Capital affiliate's purchase.  The Entity Defendants did not benefit from this activity, and the Hebert / Lux Capital affiliate were the only beneficiaries. Though Matterport's CFO testified at the first phase trial in this Action that the Hebert / Lux Capital investment in the PIPE would send a signal about the quality of the transaction to the market, this made no sense because several investors that were much more well-known and prestigious than Lux participated in the PIPE including Fidelity, Tiger Global, Miller Value and BlackRock.  Therefore, there was no valid reason for the Hebert / Lux Capital affiliate, which already owned well over a million Legacy Matterport shares, to purchase a small amount of shares in the PIPE other than to evade the lockup.  On information and belief, to the extent that the Lux affiliate did not sell the Matterport shares that it received as merger consideration before the lockup period expired, that was due to the transaction being exposed by Brown and this action.

79.    Director Defendant Jason Krikorian was associated with DCM, another large shareholder of Legacy Matterport and knew that he and his affiliates would have to agree to be locked up as part of any de-SPAC transaction. Therefore, he had an interest to ensure that all other Legacy Matterport shareholders who would receive Matterport shares also would be locked up so that those shareholders could not sell Matterport shares before he and/or the DCM affiliate could sell.

80.     Director Defendant Pittman was also the CEO of Legacy Matterport and held options to purchase a substantial number of Legacy Matterport shares. Therefore, he knew that he would have to agree to be locked up as part of any de-SPAC transaction and had an incentive to lock up all other Legacy Matterport shareholders who would receive Matterport shares so that they could not sell shares before he was able to exercise his options and sell his shares.

81.     Director Defendant Gustafson held an option to purchase a substantial number of Legacy Matterport shares and, as a director, knew that he would have to agree to be locked up as part of any de-SPAC transaction and had an incentive to lock up all other Legacy Matterport shareholders who would receive Matterport shares so that they could not sell shares before he was able to exercise his options and sell his shares.

82.     Because the Director Defendants knew that they would have to agree to be locked up as part of any de-SPAC transaction, and therefore wanted all other Legacy Matterport shareholders to be locked up, they did not even try to negotiate a lockup with Gores Holdings VI that would apply to less than all Legacy Matterport shareholders, thereby breaching their fiduciary duties to those shareholders including Brown.  In addition, they proposed to counsel for Gores Holdings VI through Legacy Matterport's counsel that all Legacy Matterport shareholders be locked up via new bylaws that would be adopted in the de-SPAC

EXH. 1-31

rather than by agreement as is typical.  In other words, they took affirmative steps to impose the lockup on Legacy Matterport shareholders without consent.

83.     By approving the de-SPAC merger and the A&R Bylaws, Director Defendants breached their fiduciary duty to Legacy Matterport shareholders, including Brown, by imposing lockup restrictions on those shareholders' shares to which they had not consented.  Such conduct was self-interested as all of the Director Defendants manipulated Matterport's corporate machinery to prevent or try to prevent Legacy Matterport shareholders, including Brown (one of Matterport's largest shareholders and likely the largest non-consenting shareholder), from selling their shares before the Director Defendants had an opportunity to sell their and their affiliates' own shares.

84.     Imposing transfer restrictions via the SPAC's bylaws rather than by individual agreement -- a relatively novel corporate procedure -- implicates the equitable concept of consent inherent in DGCL Section 202(b)'s protections because the touchstone of Section 202(b) is shareholder consent.  In this Action, the concept is not merely implicated, it was clearly thwarted because there is no dispute that Defendants implemented the bylaw transfer restriction over the objections of a major shareholder.

85.     Not surprisingly, Defendants have never directed Brown or this Court to any de-SPAC transaction that amended the SPAC's bylaws to unilaterally

EXH. 1-32

impose transfer restrictions over a shareholder's objection.  In essence, Defendants seized upon an already novel and untested procedure, and contorted it even further to inequitable ends, to try to unilaterally impose lockup restrictions against a shareholder's will.

86.    The inequitable and bad faith nature of Defendants' conduct and the Director Defendants' breach of their fiduciary duties is further confirmed by Defendants' efforts to "re-paper" the Business Combination Transaction after Brown alerted them that a transfer restriction to which he did not consent, even if the restriction were imposed via bylaws, would violate Section 202.

87.    The Director Defendants responded by doubling down on their inequitable conduct.  They attempted to re-paper the Business Combination Transaction, alter the sequencing of the Business Combination Transaction, and to make the A&R Bylaws effective prior to the consummation of the Business Combination Transaction, contrary to the representations in the Merger Agreement approved by shareholders and contrary to Matterport's prior SEC filings.

88.    For instance, in the publicly-filed February 7, 2021 Merger Agreement, Defendants represented that the new Bylaws "will become the Post-Combination Company's bylaws assuming the consummation of the Business Combination," "are expected to be in effect in such form as of the consummation of the Business Combination," and "will be effective upon the consummation of

EXH. 1-33

the Business Combination." In response to this Action, Defendants changed their position to claim that the A&R Bylaws took effect prior to the Business Combination, even executing a Board Consent purporting to make the Bylaws effective on July 21, 2021.

89.     Such conduct is merely the latest in a string of measures designed to disenfranchise Brown as a shareholder and allow Director Defendants to find a way to force through unilateral transfer restrictions that protect their own financial interests and which they could not obtain by agreement via arms-length negotiations with Brown.  No good faith motive supports the Director Defendants' conduct.

90.     In the face of these facts, any protestation by Defendants that such transfer restrictions are "routine" rings hollow. The transfer restrictions Defendants sought to enforce against Brown precluded Brown from having a fair and reasonable opportunity to exercise important exit rights, circumvented the protections of Section 202, attempted to impose a lockup Defendants could not obtain via arms-length negotiations, were adopted, enacted, and enforced by conflicted directors, and only served to enrich the Director Defendants.

91.     The inequitable and bad faith nature of Defendants' conduct and the Director Defendants' breach of their fiduciary duties is further confirmed by their efforts to continue to prevent Brown from transferring his Matterport shares even

EXH. 1-34

after Brown explained to Matterport that, pursuant to the express terms of the A&R Bylaws, his Matterport shares were not Lockup Shares.

92.     As a direct and proximate result of the Director Defendants' breaches of their fiduciary duties, Brown has incurred damages in an amount to be determined by proof.  Among other damages, Brown should be compensated for the losses he incurred from the Director Defendants causing Matterport to prevent him from selling his shares.  These damages should be calculated by identifying a reasonable period after the restriction was imposed during which Brown could have otherwise sold the shares and then selecting the highest intermediate price during that period as the presumed sales price.  *See, e.g., Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023 (Del. 2000).  Here, AST mailed Brown notice that he had been issued 5,713,441 Matterport shares on November 22, 2021, and Brown received the notice on or about November 27, 2021.  A reasonable period to sell the shares would be approximately 10 trading days which would end on December 10, 2021.  The highest intermediate price during this period occurred on December 1, 2021, when Matterport's stock price was $37.60, so the presumed sales price of Brown's 5,713,441 shares is $214,825,381.60.  From the presumed sales price the Court should deduct the average share price during a reasonable period after the restriction was lifted during which Brown could have sold his shares.  *See, e.g., Duncan v. TheraTx, Inc.*, 775 A.2d at 1024.  Here, the restriction was lifted on

EXH. 1-35

January 11, 2022.  Using the same approximately 10 trading days as the reasonable period to sell the shares, the period would end on January 25, 2022.  The average price of Matterport shares during the period was approximately $12.87 per share, making the presumed sales price $73,531,985.67.   Therefore, Brown's damages amount to approximately $141,293,395.93 and the Court should award him that amount against the Director Defendants plus prejudgment interest.  These time periods and calculations will be refined through expert testimony.

## COUNT IV
## UNIFORM COMMERCIAL CODE
### (Against Matterport)

93.     Brown repeats each and every allegation contained in paragraphs 1 through 57 above as if fully set forth herein.

94.     On or about November 22, 2021, Matterport's transfer agent mailed the Book-Entry Advice for Brown's 5,713,441 uncertificated shares of Matterport stock to Brown.  The Book Entry Advice incorrectly stated that the shares were subject to lockup restrictions set forth in the A&R Bylaws.

95.     On November 23, 2021, Brown filed with the Court and served on Matterport his Pre-Trial Brief in this Action.  In his Pre-Trial Brief, Brown explained that under the plain language of the A&R Bylaws, his Matterport shares were not subject to the lockup restrictions.

EXH. 1-36

96.    On November 24, 2021, Brown sent to Matterport a formal instruction and demand that Matterport or its transfer agent deliver Brown's Matterport shares to Brown's brokerage account at Fidelity Investments unrestricted and free of restrictive legend since the shares were not subject to the transfer restrictions set forth in the A&R Bylaws.  The demand stated:  "**Please be on notice that Matterport will be liable for any loss resulting from a delay in delivering the unrestricted shares to Mr. Brown's account."**  Matterport did not deliver the shares.

97.    On November 30, 2021, Brown sent a formal instruction and demand to AST, with a copy to Matterport, to deliver Brown's Matterport shares to Brown's brokerage account at Fidelity Investments.  In that letter, Brown explained that the shares were not subject to the transfer restrictions.  AST did not deliver the shares.

98.    The request to remove restrictions from the shares and deliver them to Brown's account at Fidelity Investments constitutes a request to register a transfer of the shares under the Uniform Commercial Code as enacted in Delaware and elsewhere.

99.    Under 6 *Del. C.* § 8-401(a), Matterport had a duty to register the transfer requested by Brown.  All of the requirements to create a duty on the part of Matterport to register the transfer had been met, or were inapplicable or excused,

EXH. 1-37

including: (1) Brown was eligible to have the shares registered in his name without restriction; (2) the instruction was made by an agent who had actual authority to act on behalf of Brown; (3) the instruction was genuine and authorized; (4) any applicable law relating to the collection of taxes had been complied with; (5) the transfer did not violate any restriction on transfer imposed by the issuer; (6) a demand that the issuer not register a transfer has not become effective; and (7) the transfer was in fact rightful.

100.   Matterport first failed and refused to register the transfer, and then, on January 11, 2022, belatedly registered the transfer which was an unreasonable delay.

101.   Under 6 *Del. C.* § 8-401(b), Matterport is liable to Brown for his loss resulting from its failure, refusal and unreasonable delay in registering the transfer.

102.   Matterport should have registered the transfer on or shortly after Brown demanded that it transfer his shares on November 24, 2021.  Matterport's refusal, failure and unreasonable delay in registering the transfer prevented Brown from selling his Matterport shares causing him damages.

103.   Brown's damages should be calculated by identifying a reasonable period after the transfer was refused based upon the restriction during which Brown could have otherwise sold the shares and then selecting the highest intermediate price during that period as the presumed sales price.  *See, e.g.,*

38

EXH. 1-38

*Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023 (Del. 2000).  Here, Brown requested removal of the restriction / the transfer on November 24, 2021, and the transfer should have been effected on November 29, 2021, the next business day after the Thanksgiving weekend.  A reasonable period to sell the shares would be approximately 10 trading days after that which would end on December 13, 2021. The highest intermediate price during this period occurred on December 1, 2021, when Matterport's stock price was $37.60, so the presumed sales price of Brown's 5,713,441 shares is $214,825,381.60.  From the presumed sales price the Court should deduct the average share price during a reasonable period after the restriction was lifted during which Brown could have sold his shares.  *See, e.g., Duncan v. TheraTx, Inc.*, 775 A.2d at 1024.  Here, the restriction was lifted on January 11, 2022.  Using the same approximately 10 trading days as the reasonable period to sell the shares, the period would end on January 25, 2022.  The average price of Matterport shares during the period was approximately $12.87 per share, making the presumed sales price $73,531,985.67.  Therefore, Brown's damages amount to approximately $141,293,395.93.  Matterport is liable to Brown for damages in this amount, plus prejudgment interest.  These time periods and calculations will be refined through expert testimony.

## **PRAYER FOR RELIEF**

WHEREFORE, Brown requests judgment in his favor as follows:

EXH. 1-39

A.      On his First Count, monetary damages against Matterport and Legacy Matterport to compensate Brown for the harm caused by their enforcement of the transfer restrictions in the A&R Bylaws against Brown in the amount of approximately $141,293,395.93 or such other amount to be proven, plus prejudgment interest.

B.      On his Second Count, monetary damages against Matterport and the Director Defendants to compensate Brown for the harm caused by their preventing Brown from transferring his Matterport shares in the amount of approximately $141,293,395.93 or such other amount to be proven, plus prejudgment interest or, alternatively, an order requiring the issuance of a sufficient number of additional Matterport shares to Brown to compensate Brown for the loss caused by Matterport and the Director Defendants' actions.

C.      On his Third Count, monetary damages against the Director Defendants for the losses Brown incurred that were caused by the Director Defendants imposing the transfer restrictions on Brown in the amount of approximately $141,293,395.93 or such other amount to be proven, plus prejudgment interest.

D.      On his Fourth Count, monetary damages against Matterport for its refusal, failure and delay in registering the transfer requested by Brown in the

amount of approximately $141,293,395.93 or such other amount to be proven, plus

prejudgment interest.

      E.      Pursuant to 10 *Del. C.* § 6510, awarding Brown his costs.

      F.      Awarding Brown any and all such other relief as the Court determines

to be just and proper.


|  |  |
|---|---|
|  | /s/ *Joseph L. Christensen* |
| Of Counsel: | Thomas A. Uebler (#5074) |
|  | Joseph L. Christensen (#5146) |
| Edward D. Totino | McCollom D'Emilio Smith |
| Benjamin W. Turner |  Uebler LLC |
| Baker McKenzie LLP | 2751 Centerville Road, Suite 401 |
| 10250 Constellation Boulevard | Wilmington, DE 19808 |
| Suite 1850 | (302) 468-5960 |
| Los Angeles, CA 90067 |  |
|  | *Attorneys for William J. Brown* |
| September 16, 2022 |  |

EXH. 1-41

## CERTIFICATE OF SERVICE

I certify that, on September 16, 2022, a true and correct copy of the *Verified Third Amended Complaint* was served on the following counsel of record by File & Serve*Xpress*:

Robert L. Burns, Esquire
Daniel E. Kaprow, Esquire
Kyle H. Lachmund, Esquire
Melissa A. Lagoumis, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

Peter J. Walsh, Jr., Esquire
Matthew F. Davis, Esquire
Potter Anderson & Corroon LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801


*/s/ Joseph L. Christensen*
Joseph L. Christensen (#5146)

MDSU W0230160.v1

EXH. 1-42